UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEVIN GROS MARINE, INC.,                        CIVIL ACTION
CAROLINE GROS OFFSHORE,
L.L.C. AND KEVIN GROS
OFFSHORE, L.L.C.

VERSUS                                          NO: 07-1433

WEEKS MARINE, INC.                              SECTION: R(5)


<u>**ORDER AND REASONS**</u>

The Court conducted a trial on the stipulated record on plaintiffs' claims of negligence in this admiralty case. The Court has original jurisdiction over this matter pursuant to the Court's admiralty jurisdiction under 28 U.S.C. § 1333. The substantive law applicable to this case is the general maritime law of the United States. After reviewing all of the evidence, the Court rules as follows. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

I.   **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

   A.   **Background**

   Plaintiffs Kevin Gros Marine, Inc., Caroline Gros Offshore, LLC, and Kevin Gros Offshore, LLC, brought this action under maritime law for two separate allisions that allegedly occurred between vessels owned and operated by plaintiffs and a submerged dredging pipeline owned and operated by defendant Weeks Marine, Inc.  Defendant was conducting dredging operations in December 2006 to maintain a deep navigation channel in the Freshwater Bayou on the Mermentau River in Vermillion and Cameron Parishes in southwest Louisiana under a contract with the U.S. Army Corps of Engineers.  Plaintiffs' CHANTISE G was allegedly headed southbound in the Freshwater Bayou Channel when it struck a submerged object on December 16, 2006.  Plaintiffs' CAROLINE G was allegedly headed southbound in the channel when it struck a submerged object on December 20, 2006.  Plaintiffs sued Weeks on March 26, 2007, and alleged that their vessels struck defendant's submerged pipeline.  Plaintiffs claim that the damage their vessels sustained in the allisions resulted from the negligence and fault of Weeks in failing to properly mark its dredge pipe.

   B.   **Legal Standard**

   Since this Court's jurisdiction is grounded in admiralty, it is "guided by general principles of negligence law." *Consolidated*

2

*Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).  To establish a negligence claim under these circumstances, the plaintiffs must show that the defendant owned, placed, or maintained a submerged obstruction that allegedly damaged plaintiffs' vessel. *See Creppel v. Shell Oil Co.*, 738 F.2d 699, 701 (5th Cir. 1984); *Guidry v. Apache Corp. of Delaware*, 236 Fed. Appx. 24 (5th Cir. 2007).  That defendant's operations were close to the allision site is insufficient to establish liability. *Guidry*, 236 Fed. Appx. at 25.

The legal standard applicable here is illustrated by *Creppel.*  There, the plaintiff's vessel struck a submerged pipe when it sailed through an area in which Shell Oil held exclusive mineral lease rights. 738 F.2d at 699.  A jury found Shell negligent and awarded the plaintiff damages. *Id.*  The Fifth Circuit reversed, finding that the district court should have instructed the jury that a finding that defendant owned, placed, maintained, or controlled the submerged pipeline was a prerequisite to liability. *Id.* at 702.  The court emphasized that the plaintiff "offered no direct proof that the object which he hit belonged to or was placed in the water by Shell or was under its control." *Id.* at 701.  Still, the Court recognized that there was "circumstantial evidence in the record from which a jury might have found that Shell owned, maintained, placed, or

3

controlled the pipe in the leased area" because of the nature of Shell's oil exploration project and the kind of pipe involved in the accident. *Id.* at 702.  Thus, plaintiffs must prove that Weeks "owned, placed, or maintained" the submerged obstruction that damaged their vessels, but plaintiffs may rely on circumstantial evidence in attempting to meet its burden of proof.

**C.   Application**

Here, the Court finds that plaintiffs have not proven that Weeks owned, maintained, placed, or controlled the submerged object struck by the CHANTISE G and the CAROLINE G.  Rather, the following evidence showed that defendant's pipeline was located outside the channel where plaintiff's vessels traveled and allided with the object that caused them damage.

**1.   Location of the Pipeline**

Weeks contracted with the U.S. Army Corps of Engineers to perform maintenance dredging in the Freshwater Bayou Channel, from mile 1.3 to mile -4.0 in Vermilion Parish.[1]  The channel is 250 feet wide on the outside, that is, the portion of the channel away from land, and narrows to 125 feet going toward the shore.[2]

---

[1]Def's Ex. 1.

[2]Deposition Testimony of Alberto Saavedra, 12:14-23.

The channel runs on a north-south axis.[3]  Even-numbered red beacons and buoys line the channel on the east side, and odd-numbered green beacons and buoys line the channel on the west side.  The beacons closest to the shore have the highest numbers, and those numbers decrease as the channel approaches the Gulf of Mexico.  Weeks Marine was dredging with the VENTURE, a hydraulic dredge.[4]  Weeks deposited the spoil from the dredging into a disposal area on the west side of the channel adjacent to Beacon Seven.[5]  Weeks transported the material dredged out of the channel to the disposal area by using submerged pipelines ("sublines") and floating pipelines known as pontoons.[6]  The floating pipelines were marked by buoys with blinking lights every 100 feet.[7]  The subline connections were marked by buoys with steady burning lights.[8]  The subline consisted of pieces of

---

[3]Deposition Testimony of Cecil Wiltz, 9:15-17.

[4]Deposition testimony of Clyde Wyble 7:9-11.

[5]Deposition testimony of Clyde Wyble, 14:10-12.

[6]Deposition Testimony of Cecil Wiltz, 9:6-25.

[7]Deposition Testimony of Clyde Wyble, 18:10-19.

[8]Deposition Testimony of Clyde Wyble, 19:20-20:2.

pipe, thirty inches round[9] and approximately 720 feet long,[10] with a ball attached on one end and a bell attached on the other.[11] The ball and bell connected the sublines together with a "joint latch."[12]

The subline was located to the west of the channel.[13]  Both the Captain and the Deck Captain of the dredge testified that all of the subline was located outside of the channel.[14]  The Captain explained that the subline had to be placed outside of the channel, as otherwise the VENTURE would not be able to dredge.[15] Alberto Saavedra, Weeks' Marine's project engineer, testified that Weeks used a fathometer and its GPS unit to take hot fixes of the pipeline, which are marks that specify its location.[16] Weeks entered an RCAD map into evidence which reflected the hot fixes for the subline and showed that the subline was submerged

---

[9]Deposition Testimony of Clyde Wyble, 23:9-10.

[10]Deposition Testimony of Alberto Saavedra, 96:6-8.

[11]Deposition Testimony of Clyde Wyble, 22:21-24; Deposition Testimony of Alberto Saavedra, 26:24-25.

[12]Deposition Testimony of Timmy Anselmi, 23:1-10.

[13]Deposition Testimony of Cecil Wiltz, 15:23-16:2.

[14]Deposition Testimony of Cecil Wiltz, 19:5-7; Deposition Testimony of Clyde Wyble, 26:1-8.

[15]Deposition Testimony of Clyde Wyble, 28:7-14.

[16]Deposition Testimony of Alberto Saavedra, 25:2-10, 31:6-9.

entirely outside of the channel.[17]  Saavedra further testified
that the subline does not move once it has been sunk.[18]
Additionally, plaintiffs submitted a side scan sonar that also
places the subline entirely outside of the channel, although
further east than defendant asserts it was located.[19]  Based on
the testimony and exhibits, the Court finds that the submerged
pipeline was located entirely outside of the channel.

   2.   **Location of the CHANTISE G at the time of the allision**

   Based on the following evidence, the Court finds that
plaintiff has not proven that the CHANTISE G was in proximity of
the subline at the time of the allisions.  The majority of the
credible testimony indicated that while the subline was not in
the channel, the CHANTISE G was.  On December 16, 2006, the
CHANTISE G struck a submerged object when it was sailing
southbound in the channel.[20]  The CHANTISE G was captained by
Douglas Broughton, who had been through the channel over 200
times and was very familiar with it.[21]  Before entering the

_____

   [17]Def's Ex. 4.

   [18]Deposition Testimony of Alberto Saavedra, 49:20-23.

   [19]Def's Ex. 15.

   [20]Pl's Ex. L.

   [21]Deposition testimony of Douglas Broughton, 9:10-21.

7

channel, Broughton made contact with the dredge and was informed that the subline was 250 feet west of the channel.[22]  The Captain also looked over the Notice to Mariners for the channel, which specified that there was a floating pipeline in the area, but did not mention the sublines used for the dredging.[23]  Still, Captain Broughton recalled that the entire subline was marked and that no part of it was in the channel.[24]

Captain Broughton testified that the vessel was about 100 to 300 feet northeast of Beacon No. 9 when it struck the object.[25]  He further specified that the vessel was about 30-50 feet inside of the channel when it hit the object.[26]  Deckhand John Otis Wood testified that the CHANTISE G was as far as 200 feet east of the green buoys, towards the center of the channel.[27]  Captain Broughton testified numerous times that the vessel was in the channel at the time of the allision.[28]  The

---

[22]Deposition testimony of Douglas Broughton, 15:18-23.

[23]Deposition testimony of Douglas Broughton, 15:25-16:8.

[24]Deposition testimony of Douglas Broughton, 46:15-20.

[25]Deposition testimony of Douglas Broughton, 13:7-12.

[26]Deposition testimony of Douglas Broughton, 20:1-3.

[27]Deposition testimony of John Otis Wood, 17:13-18.

[28]Deposition testimony of Douglas Broughton, 20:6-25, 24:2-13, 35:12-14.  Broughton also identified the accident site as

8

OS/relief engineer of the CHANTISE G, Robert Brashear, and Wood confirmed that the vessel was inside of the channel at the time of the allision.[29]  Captain Broughton explained that he knew the vessel was inside of the channel because if it were not, Beacons 9 and 11 would have crossed the center of the radar.[30]  He further explained that these beacons could not have been moved, since, unlike buoys, they were driven into the ground.[31] Although one witness testified that Green Buoy 9 was not in the channel at the time its hot fix was taken, the evidence on which he relies shows that the buoy was significantly east of the subline.[32]  As such, if the vessel were to the east of Buoy 9 as Captain Broughton testified, the vessel was not in proximity to Weeks' subline.

Further, plaintiffs presented no evidence that would suggest that they marked the allision at the time it occurred and that the allision was near the subline.  In fact, they did not mark

_____

100-300 feet north of Beacon 9 on the Coast Guard accident form. *See* Pl's Ex. L.

[29]Deposition testimony of Robert Brashear, 44:2-9; Deposition testimony of John Otis Wood, 13:9-24.

[30]Deposition testimony of Douglas Broughton, 20:6-8.

[31]Deposition testimony of Douglas Broughton, 20:13-21.

[32]Deposition testimony of Alberto Saavedra, 71:1-9; Def's Ex. 4.

the location of the allision at all.  Captain Broughton testified that he did not mark the location at the time of the accident,[33] although he did radio an approximate position of where it occurred.[34]  Brashear also testified that he did not know of anyone who marked the place of impact at the time of the accident or made an effort to identify the object that was hit.[35]  Only 26 hours later did Broughton actually mark the approximate location of the allision in the vessel's GPS system.[36]  Additionally, no one went out to find and identify the object that caused the accident until weeks later, and at that time, they found only scars in the mud.[37]  The foregoing evidence convinces the Court that defendant's pipeline was not in proximity to the CHANTISE G at the time of the allision.

**3.   Location of the CAROLINE G at the time of the allision**

The Court likewise finds that the CAROLINE G was not in proximity to defendant's pipeline at the time of the allision. On December 20, 2006, the M/V CAROLINE G struck a submerged

---

[33]Deposition testimony of Douglas Broughton, 36:10-12.

[34]Deposition testimony of Douglas Broughton, 23:19-24.

[35]Deposition testimony of Robert Brashear, 19:23-20:20.

[36]Deposition testimony of Douglas Broughton, 37:1-6.

[37]Deposition testimony of Douglas Broughton, 45:11-17.

object while sailing southbound in the channel.[38]  Mike Quinn

captained the CAROLINE G, and he also was experienced in

navigating the Freshwater Bayou Channel.[39]  Although Captain

Quinn did not make a note of the GPS coordinates at the time of

the accident,[40] he testified that the CAROLINE G was "absolutely"

within the channel when it struck the object.[41] Captain Quinn

testified that the vessel was 10-12 minutes south of Beacon 9,

between Buoys 8 and 6, when the accident occurred.[42]  He said

that, about a minute before the allision, the lookout spotted a

floating barrel, and he steered the vessel to the port side, away

from the west side of the channel, to increase its distance of

clearance.[43]  Quinn believes the vessel ran over a barrel that

may have been submerged.[44]  In addition, deckhand Augustine Buadu

also confirmed that the CAROLINE G was inside of the channel.[45]

Again, plaintiffs presented no evidence that would suggest

_____

[38]Deposition testimony of Mike Quinn, 40:2-7.

[39]Deposition testimony of Mike Quinn, 97:7-13.

[40]Deposition testimony of Mike Quinn, 39:16-22.

[41]Deposition testimony of Mike Quinn, 39:23-40:1.

[42]Deposition testimony of Mike Quinn, 38:13-19; 45:15-18.

[43]Deposition testimony of Mike Quinn, 100:7-101:7.

[44]Deposition testimony of Mike Quinn, 44:11-13.

[45]Deposition testimony of Augustine Buado, 14:24-15:1.

that they marked the accident at the time it occurred and that it
was near the subline.  For all the foregoing reasons, the Court
finds that defendant's pipeline was not in the proximity of the
CAROLINE G at the time of the allision.

### 4.   Plaintiffs' evidence

Plaintiffs have put forth no direct evidence that it was
defendant's pipe that was involved in the two allisions.
Plaintiffs heavily rely on two pieces of circumstantial evidence.
Plaintiffs emphasize that at the time of the allisions, Weeks was
the only entity conducting operations that involved submerged
pipe in the vicinity of the allisions.  Plaintiffs' surveyor,
Timmy Anselmi, conducted a side scan sonar of the channel on
January 2, 2007.  The scan indicated that Weeks' dredging
pipeline was the only pipeline in the area.[46]  At the time of the
accident, defendant's subline and floating pipeline were
connected north of Beacon 9.[47]

Additionally, plaintiffs rely on evidence that shows a
correspondence between a mold that taken of the gashes in their
vessels' hulls and the shape of a dredge pipe joint similar to

---

[46]Deposition testimony of Timmy Anselmi, 17:10-24.

[47]Deposition testimony of Clyde Wyble, 49:12-19.

the one used by Weeks.[48]  After the allisions, both vessels were dry-docked for repairs.  The CHANTISE G sustained damage on its bottom hull plating, primarily along the starboard side.[49]  The vessel also sustained some rudder and propellor damage.[50]  The CAROLINE G similarly sustained damage to its bottom hull plating, but had less underwater gear damage and more tank damage.[51] Surveyor Anselmi took "reverse molds" of the damage to the bottom hulls by placing an epoxy resin in the damaged indentations of both hulls.[52]  Anselmi took these molds to try to match the damage to the object that caused it.[53]  The molds were nearly identical, which he contends suggests that the vessels were damaged by the same object.[54]

Anselmi then took the molds to Weeks' facility in Houma to compare them to a 30-inch dredge pipe with a ball joint latch

---

[48]*See* Pl's Trial Brief at 17-18.

[49]Deposition testimony of Timmy Anselmi, 5:22-6:7; Deposition testimony of Guy Plaisance, 6:6-11.

[50]Deposition testimony of Guy Plaisance, 6:14-15.

[51]Deposition testimony of Guy Plaisance, 10:12-21.

[52]Deposition testimony of Timmy Anselmi, 7:11-18; 9:21-10:6; 28:8-11.

[53]Deposition testimony of Timmy Anselmi, 9:25-10:6.

[54]Deposition testimony of Timmy Anselmi, 28:22-29:13.

that Weeks used for "training."[55]  Anselmi testified that the
mold was a "tight fit" with the padeye of the dredge pipe.[56]
Anselmi testified that, since the mold was a tight fit and the
side scan sonar showed no other objects located near the alleged
area of the incident, he thought it was more probable than not
that the vessels were damaged by the padeye on Weeks' pipeline.[57]
Weeks' surveyor testified that the CHANTISE G and the CAROLINE G
struck an object similar to Weeks' dredging pipe, but that it was
unclear whether it was Weeks' pipeline or another old piece of
pipe left out there from some other event.[58]

On the other hand, the great majority of the evidence, which
the Court has already discussed, indicates that plaintiffs'
vessels were in the channel at the time of the allisions[59] and
defendant's subline was located outside of the channel.[60]

---

[55]Deposition testimony of Timmy Anselmi, 22:14-23:6.

[56]Deposition testimony of Timmy Anselmi, 25:4-7.

[57]Deposition testimony of Timmy Anselmi, 25:10-19.

[58]Deposition testimony of Guy Plaisance, 18:3-13.

[59]Deposition testimony of Douglas Broughton, 20:1-3;
Deposition testimony of John Otis Wood, 17:13-18; Deposition
testimony of Robert Brashear, 44:2-9;Deposition testimony of Mike
Quinn, 39:23-40:1; Deposition testimony of Augustine Buado,
14:24-15:1.

[60]Deposition Testimony of Cecil Wiltz, 19:5-7; Deposition
Testimony of Clyde Wyble, 26:1-8.

Besides all of this evidence, defendant's evidence showed that
the subline was well west of the beacons that demarcate the
channel boundaries and that any floating pipeline in the channel
was clearly marked.[61]  Captain Wiltz further testified that Weeks
did not lose any equipment.[62]  Saavedra likewise testified that
he did not recall losing any subline.[63]  Plaintiffs have not
submitted any evidence to controvert this proof, other than to
point to the circumstantial factors discussed *supra*.

Further, as previously noted, the crew of neither vessel
made any attempt to determine what their ships had struck.  The
only documented attempt to determine what objects were submerged
in the vicinity of the accidents was a side sonar scan conducted
on January 2, 2007 that showed defendant's subline located
approximately 70 feet west of Beacon 9, lying at a two-degree
angle pointing north toward Beacon 11.[64]  Plaintiffs, however,
have put forth no evidence that the pipe at this angle would have
protruded into the shipping channel north of Beacon 9.

---

[61]Deposition testimony of Cecil Wiltz, 19:5-7; Deposition
Testimony of Clyde Wyble, 26:1-8.

[62]Deposition testimony of Cecil Wiltz, 19:11-20:16.

[63]Deposition testimony of Alberto Saavedra, 80:12-14.

[64]*See* Def's Ex. 15; Deposition testimony of Timmy Anselmi,
17:13-18:18.

Additionally, there is no evidence or testimony that indicates plaintiffs or any other entity found obstructions south of Beacon 9, where, according to some of plaintiffs' accounts, the allisions occurred.

Although the mold that plaintiff made of the hull damage roughly matches the shape of a dredge joint located in defendant's yard, this evidence is insufficient to establish liability.  There is no evidence that defendant uses a unique dredge pipe or that the pipe found in its yard was even used in this particular dredging operation.  In sum, the only evidence that plaintiffs have gathered regarding the location of defendant's pipe places it outside of the channel in an area consistent with defendant's documentation and in a place where, according to the testimony of the vessel captains, the two ships did not sail.

Additionally, there are glaring inconsistencies in plaintiffs' account of where the allisions took place.  As for the first allision involving the CHANTISE G, Captain Broughton testified that the vessel struck a submerged object approximately 100-300 feet northeast of Beacon 9.[65]  But in their trial brief, plaintiffs assert that the CHANTISE G was heading toward Beacon 6

---

[65]Deposition testimony of Douglas Broughton, 13:7-12; Pl's Ex. L.

at the time of the incident.[66]  But if the CHANTISE G was passing

Beacon 6 when the allision occurred, it would have been south of

Beacon 9, not northeast.  Defendant's RCAD map shows Beacon 9

positioned well north of Beacon 6 on the opposite side of the

channel.[67]  Beacon markers run in descending numerical order in

the southbound direction, and thus Beacon 9 should be further

north than Beacon 6.  Thus it is unclear how the CHANTISE G,

which was sailing south, could have allided with something on its

starboard side north of Beacon 9 if it was sailing past Beacon 6

when the allision occurred.

    With respect to the second allision involving the CAROLINE

G, Captain Quinn testified that the allision occurred "10-12

minutes" south of Beacon 9, between Beacon 8 and Beacon 6.[68]

Plaintiffs assert that this location is consistent with the

allision involving the CHANTISE G.[69]  But this account raises two

problems.  For one, it is inconsistent with Captain Broughton's

testimony that the accident occurred northeast of Beacon 9, as

well as the information he filled out on the Coast Guard accident

---

[66]*See* Pl's Trial Brief at 14.

[67]Def's Ex. 4.

[68]Deposition testimony of Mike Quinn, 38:13-19.

[69]Pl's Trial Brief at 14.

17

form.[70]  But even if both allisions occurred south of Beacon 9, it is unclear how defendant is responsible since there is no evidence that supports a finding that defendant's equipment was located between Beacons 8 and 6.  Plaintiffs' side scan sonar shows the position of Weeks' subline between Beacons 9 and 11.[71] The scan was performed only between Beacons 11 and 8, and plaintiffs have provided no evidence of the subline's position between Beacons 8 and 6.[72]

The problems associated with plaintiffs' shifting accounts of where the allisions took place are compounded by the fact that the vessels' crews did not document the locations of the allisions when they occurred.  As plaintiffs have not verified the location of where the allisions occurred and have provided conflicting accounts as to whether the allision of the CHANTISE G occurred northeast of Beacon 9 or between Beacons 8 and 6, the Court finds that plaintiffs have not proven that both vessels struck even the same submerged object, much less an object that was "owned, placed, or maintained" by defendant.  For all of the foregoing reasons, the Court finds that plaintiffs have not

---

[70]*See* Deposition testimony of Douglas Broughton, 13:7-12; Pl's Ex. L.

[71]*See* Def's Ex. 15.

[72]*See* Deposition testimony of Timmy Anselmi, 54:7-10.

18

proved their negligence claim by a preponderance of the evidence.

**G.   *Res ipsa loquitur***

Plaintiffs contend that the doctrine of *res ipsa loquitur* shifts the burden of proof to the defendant.  In admiralty, *res ipsa loquitur* creates a rebuttable presumption of negligence if "1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of a type that ordinarily does not occur in the absence of negligence. *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1115-16 (5th Cir. 1985) (citing *Johnson v. United States*, 333 U.S. 46 (1948)).  But as the Ninth Circuit has pointed out in a case on which plaintiff relies, the doctrine "is a form of circumstantial evidence that permits an inference of negligence to be drawn from a proven set of facts." *Ashland v. Ling-Temco Vought, Inc.*, 711 F.2d 1431, 1437 (9th Cir. 1983).

Here, plaintiffs have not met their burden of proving that the object that their vessels struck was under the exclusive control of the defendant.  Plaintiffs have not identified the object that their vessels allegedly struck, and they have provided conflicting testimony as to where the allisions took place.  In their trial brief, plaintiffs allege that the allisions took place between Beacons 8 and 6, but they have

19

provided no evidence that defendant was operating in that area. Thus, as plaintiffs have not proven what their vessels struck or that defendant was operating in the area where the allisions allegedly took place, plaintiffs have not shown that the defendant exclusively controlled the object causing damage to plaintiffs' vessels.  As such, they cannot invoke *res ipsa loquitur*.

**H.   The Pennsylvania Rule**

Plaintiffs also contend that the "Pennsylvania Rule" should shift the burden of proof to the defendant.  The rule states that when:

> [A] ship at the time of a collision is in actual
> violation of a statutory rule intended to prevent
> collisions, . . . the burden rests upon the ship of
> showing not merely that her fault might not have been
> one of the causes, or that it probably was not, but
> that it could not have been.

*The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136 (1873).  The Fifth Circuit has applied the rule in cases involving allisions. *See Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 786 (5th Cir. 2003).  Thus if defendant was in violation of a statutory rule intended to prevent allisions, the Pennsylvania Rule shifts the burden to the defendant to prove that it was not at fault in causing the allision.  Plaintiffs contend that the Pennsylvania Rule applies since Weeks violated

20

two Coast Guard regulations.  Specifically, plaintiffs allege
that Weeks violated federal regulations by not displaying two red
lights at each end of its floating pipeline, 33 C.F.R. § 88.15(b)
and by failing to adequately mark the submerged pipeline and
maintain its buoys, 33 C.F.R. § 64.11.

The Court finds that the Pennsylvania Rule does not apply
since plaintiffs have not proven that defendants violated the
regulations.  The regulation involving the first alleged
violation requires that:

> Dredge pipelines that are floating or supported on
> trestles shall display the following lights at night
> and in periods of restricted visibility . . . (b) two
> red lights at each end of the pipeline, including the
> ends in a channel where the pipeline is separated to
> allow vessels to pass (whether open or closed).

33 C.F.R. § 88.15.  Plaintiffs assert that Captain Wiltz's
testimony establishes a violation of the regulation.[73]  But
plaintiffs considerably mischaracterize Wiltz's testimony.  Wiltz
merely testified that the pipeline was not marked with red lights
at the underwater connection between the floating pipeline and
the subline.[74]  As the statute applies to *floating* pipelines, it
contains no requirement that two red lights mark an *underwater*
connection.  Plaintiffs have not cited any cases that have

---

[73]*See* Pl's Trial Brief at 25.

[74]Deposition testimony of Cecil Wiltz, 21: 8-15.

21

applied the regulation at issue to an underwater connection between a floating pipeline and a subline.  In contrast, in the case plaintiff cites, the dredge did not "properly place[] red lights on the *end* of the open dredge line" (emphasis added) and thus the court found that the dredging company violated the regulation. *See Complaint of American Dredging*, 873 F.Supp. 1539, 1544 (S.D. Fla. 1994).  But here, Wiltz testified that the floating pipeline did contain two red lights at its end.[75] Additionally, Joseph Valentour, the Construction Representative for the U.S. Army Corps of Engineers, testified that he did not recall any time when Weeks' subline was improperly marked.[76] Accordingly, the Court finds that plaintiff fails to prove that this regulation was violated.

Plaintiffs also contend that Weeks violated 33 C.F.R. § 64.11.  The regulation provides that:

(a) The owner of a vessel, raft, or other craft wrecked and sunk in a navigable channel shall mark it immediately with a buoy or daymark during the day and with a light at night.  The owner of a sunken vessel, raft, or other obstruction that otherwise constitutes a hazard to navigation shall mark it in accordance with this subchapter.

(b) Owners of vessels sunk in waters subject to the jurisdiction of the United States or sunk on the high

---

[75]Deposition testimony of Cecil Wiltz, 21: 12-19.

[76]Deposition testimony of Joseph Valentour, 11:10-15.

seas, if the owners is subject to the jurisdiction of
the United States, shall promptly report to the
District Commander, in whose jurisdiction the
obstruction is located, the action they are taking to
mark the sunken vessel, giving the following
information:

> (1) Name and description of the sunken vessel;
>
> (2) Accurate description of the location of the
> vessel;
>
> (3) Depth of water over the vessel; and
>
> (4) Location and type of marking established,
> including color and shape of buoy or other daymark
> and characteristic of the light.

(c) Owners of other obstructions may report the
existence of such obstructions and mark them in the
same manner as prescribed for sunken vessels.

(d) Owners of marine pipelines that are determined to
be hazards to navigation shall report and mark the
hazardous portion of those pipelines in accordance with
49 CFR parts 192 or 195, as applicable.

33 C.F.R. § 64.11.  Thus plaintiff contends that the submerged

pipeline is a hazard to navigation that must be marked under this

regulation.  Assuming, *arguendo*, that the regulation applies to

defendant's subline, plaintiffs have not shown that defendant

violated it.  As plaintiffs concede, the regulation does not

provide any specific lighting requirements.[77]  Further, the

testimony of the captains of the CHANTISE G and CAROLINE G, as

well as that of Joseph Valentour, Captain Wiltz, and Captain

---

[77]*See* Pl's Trial Brief at 25.

Wyble, all suggests that Weeks' subline was properly marked.
Captain Broughton recalled that the entire subline was marked
when the CHANTISE G was in the channel.[78]  Captain Quinn also
testified that he saw white lights marking the pipelines in the
channel.[79]  Captain Wyble testified that every connection on the
subline was marked with a buoy and a light.[80]  Captain Wiltz also
testified that the subline was marked with buoys with white
lights.[81]  As the overwhelming amount of testimony suggests that
defendant had properly marked its subline, the Court finds that
defendant did not violate 33 C.F.R. § 64.11.  Accordingly,
plaintiffs cannot avail themselves of the Pennsylvania Rule.

Nonetheless, the application of the Pennsylvania Rule would
not change the outcome of this case.  As the great weight of the
evidence shows that while the subline was located well outside of
the channel, the allisions occurred inside the channel, the Court
finds that the allisions "could not have been" the fault of the
defendant. *See The Pennsylvania,* 86 U.S. (19 Wall.) at 136.
Accordingly, defendant has shown that it was not negligent by a

---

[78]Deposition testimony of Douglas Broughton, 46:15-20, 47:17-
48:2.

[79]Deposition testimony of Mike Quinn, 96:13-22.

[80]Deposition testimony of Clyde Wyble, 19:22-25, 20:23-25.

[81]Deposition testimony of Cecil Wiltz, 10:22-11:10.

preponderance of the evidence.


**II.   SUMMARY**

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that plaintiff is not entitled to recover from defendant.


New Orleans, Louisiana, this __3rd__ day of September, 2008

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE